IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Life Plans, Inc., | ) | |
|     Plaintiff, | ) | Case No: 11 C 8449 |
| | ) | |
| v. | ) | |
| | ) | Judge Ronald A. Guzmán |
| Security Life of Denver Insurance | ) | |
| Company and ING US, Inc., n/k/a | ) | |
| Voya Financial, Inc., | ) | |
|     Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, the Court grants in part and denies in part certain of Defendants' motions in limine [164, 165, 166, 167, 168, 169] as detailed herein.

## STATEMENT

The Court assumes background knowledge of the facts of the case and the pretrial conference proceedings. Life Plans, Inc. is referred to herein either as "Plaintiff" or "LPI." Defendants are referred to either as "Defendants" or "SLD" for Security Life of Denver where appropriate.

1. Defendants' Motion in Limine #1 (Bar Alleged Admissions of Liability by Craig Umphress, Scott Carney and Francis de Regnaucourt)

The motion to bar the statements of Craig Umphress being offered by Plaintiff is denied. The statements come in as party admissions, which are an exception to the hearsay rule, regardless of whether in the form of opinions. This is the case even as to what might be considered mixed questions of fact and law that are relevant to the ultimate issue, such as the validity of Plaintiff's case against Defendants. *See* Fed. R. Evid. 801(d)(2).

The motion to bar is denied as to Scott Carney's statement: "We are probably going to write a big fat check." The Court has reconsidered its oral ruling granting the motion as to Carney's statement: "Send me a quick e-mail if you can, I guess they want to fight a lawsuit, probably will cost us more than any loss if we did it." As indicated in open court, one issue is whether the statement can reasonably be interpreted to be a statement opining on the merits of refusing to go forward with the policy issuance. One reasonable inference is that Carney is opining that the policy is financially solid and that defending any lawsuit that will result is likely to be more expensive than any potential losses from issuing the policies. On the other hand, the statement implies an assessment that there likely will be a lawsuit, which could be costly. Such a

conclusion would not be likely if Carney believed Defendants' rejection of the policies was well supported.  When coupled with Carney's other statement about having to write a big fat check, the statement could reasonably be interpreted as an opinion that the rejection is unwarranted and is likely to cause a lawsuit that will cost defendants significant expense.  The correct interpretation is a determination for the jury to make. The motion to bar this statement is therefore denied.

The motion to bar admissions by deRegnaucourt is denied for similar reasons.

2.  Defendants' Motion in Limine #2 (Bar Questions and Answers Relating to Alleged "Illegal" and "Unlawful" Conduct)

By this motion, Defendants seek an order barring Plaintiff  from introducing at trial any purported evidence, testimony and/or argument constituting or relating to questions and any witness's response to Plaintiff's counsel's purportedly improper examinations.  Specifically, Defendants' executives (Robert Leary, Rod Martin, Ewout Steenbergen,  Alain Karaoglan, Patrick Flynn, Jan Hommen and Willem Nagel) were asked to state legal conclusions or provide other testimony about whether Butch Britton's (CEO of Insurance Solutions – Retail, Life and Employee Benefits for ING US) supposed threat to criticize Plaintiff to other insurance carriers was illegal or unlawful.

In the deposition of Robert Leary (President of ING U.S. and a member of ING U.S.'s OCEO[1]), Plaintiff's counsel asked Mr. Leary at least four times whether Britton's threat to tell other insurance carriers about Plaintiff's conduct and urge them not to do business with it, constituted "unlawful" or "illegal" activity by Britton.  Plaintiff's premise is that Britton's willingness to discredit Plaintiff shows a general lack of honesty and fair dealing or good faith, and that Leary's failure to take disciplinary action would likewise reflect on his general lack of honesty, which would in turn be circumstantial evidence that he also acted in bad faith in rejecting the PEAK policy proposal.

There are several problems with this line of questioning.  First, whether Britton or Leary would contemplate "wrongfully" discrediting a company in general is not directly relevant to the issue before the jury – whether they acted in bad faith in rejecting the PEAK proposal.  To put it another way, it is only tangentially relevant and therefore lacks significant probative value.  Second, Leary's answers clearly indicate that he would need more information about the circumstances of the particular transaction involved to make a determination one way or the other about his approval of such a tactic.  Third, depending on the circumstances, informing other carriers about Plaintiff's behavior may not be improper at all and allowing a series of questions which clearly imply that it is would be misleading and confusing to the jury.  Fourth, such questions open the door for Defendants to rebut the implication with evidence of their own

---

[1] OCEO stands for the Office of the CEO, which was composed of the four most senior executives of ING.

as to whether such conduct is unlawful or illegal and therefore commence a trial within a trial about a hypothetical collateral issue.  Fifth, the relevance of Leary's noncommittal responses to these questions is further limited by the timing of the questions.  Leary's belief at the time of the deposition is not directly relevant unless it is shown he was aware of Britton's comments at the time the decision to decline the PEAK program was made.  The contrary appears to be the case.  Whatever the small probative value these questions carry, it is substantially outweighed by the danger of prejudice, confusion and unnecessary delay. The motion to bar this series of questions as to Leary is granted.

Similar questions were asked in the deposition of Ewout Steenbergen (a member of ING U.S.'s OCEO), Alain Karaoglan (a member of ING U.S.'s OCEO who was deposed and asked: "Do you know if that conduct would be a violation of the antitrust laws here in the United States?" and "Does it strike you that that might be violative of the antitrust laws of the United States?" and "Do you think that might be criminal conduct by Mr. Britton?"), Rod Martin,  (ING U.S.'s OCEO), Jan Hommen (the CEO and Chairman of ING Groep N.V.), Patrick Flynn (the CFO of ING Groep N.V.), and Willem Nagel, all of whom were asked if the hypothetical conduct would be unlawful.  The motion to bar these questions is also granted.

3. Defendants' Motion in Limine # 3 (Bar Evidence of Alleged Antisemitism)

According to Defendants, the parties initially worked on developing the PEAK policy commencing in 2009 and into early 2010, at which point they stopped their discussions.  In December of 2010, the negotiations recommenced and continued until June 2011, when the contract was signed.  Plaintiff seeks to use emails sent by certain of Defendants' actuarial employees during the initial period of negotiations to imply that antisemitism and hatred played a part in the evaluation process, thereby hoping to prove its claim of a breach of the implied covenant of good faith and fair dealing.  The statements refer to the possibility that Plaintiff and its owners are shady because the PEAK product depends on leveraging interest rates and paying for it with arbitrage.  In one such email, an actuarial assistant, referring to the suggestion that PEAK stands for "profits earned ain't kosher," indicates that the proposed interpretation is perfect.[2]  According to Plaintiff, the email constitutes evidence that antisemitism affected the PEAK evaluation process.

This conclusion is a stretch given that the statement was made months before the PEAK product rejection took place, and by a person who has not been shown to be a part of the decision-making process.  Further, the statement alone is not necessarily antisemitic given that the word "kosher" is commonly used to signify "proper," "vetted," "fair," or "within limits."  Furthermore, these actuaries were apparently part of a process which eventually resulted in a

---

[2] Other proposed interpretations of PEAK were "Pam [Simon] earns almost nothing," (with "nothing" spelled with a 'K'), and "pricing exercise about nothing," (again with "nothing" spelled with a 'K').

determination favorable to Plaintiff, *i.e.*, the PEAK product was approved. Nevertheless, at this stage of the proceedings, it is impossible for the Court to determine if this statement, taken together with all other evidence, will be sufficient to enable a reasonable juror to infer antisemitic sentiment. Accordingly, the Court denies the motion to bar any argument of antisemitism at this time. However, Plaintiff is admonished that any such argument carries a strong possibility of causing unfair prejudice to Defendants and, as a result, may require an adverse instruction to the jury if not sufficiently supported by the evidence.[3]

Plaintiff intends to use numerous other statements by this group of actuaries that are critical of the PEAK product. The statements were made before the Joint Cooperation Agreement ("JCA") was entered into, and therefore, before the covenant of good faith and fair dealing came into existence. The statements were also made during a process which resulted in the actual approval of the PEAK policy. They are, therefore, of dubious benefit to Plaintiff's case. However, they may reflect the attitudes and thought processes of Defendants' employees during some part of the evaluation process and, as such, are relevant to the issues before the jury. The motion to bar the statements is denied.

4. Defendants' Motion in Limine 4 (Bar LPI's Principals from Giving Opinion Testimony Regarding LPI's Damages)

By this motion, Defendants seek an order barring Plaintiff from introducing at trial any opinion testimony by any principal of LPI (including David Simon, Pamela Simon and Adam Simon)[4] regarding the calculation of any alleged lost net profits of LPI as damages. Plaintiff seeks to recover first-year commissions in the amount of $16.5 million dollars based upon an estimated $300 million in premiums at an average rate of 5.5%, as well as "trailing commissions." Defendants seeks to bar the Simons from testifying as to what the first-year commission percentage rate would be because the applicable commission rate is based upon the demographics of the insured, age, sex, risk characteristics the of the insured, and the duration of the policy, among other things, and the Simons are not qualified to do such an analysis.

There is a "fine line between lay and expert testimony." *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, No. 1:11-CV-190, 2014 WL 554565, at *4 (N.D. Ind. Feb. 11, 2014). "In the realm of lost profits, lay opinion testimony is allowed in limited circumstances where the witness bases his opinion on particularized knowledge he possesses due to his position within the company." *Von der Ruhr v. Immtech Intern., Inc.*, 570 F.3d 858, 862 (7th Cir. 2009). The insurance product at the center of the JCA is complex and sophisticated and the Simons have

---

[3] In that regard, the Court notes that the authors of these e-mails, Ms. Worley, Ms. Millard and Mr. Christman, were not deposed and will not testify at the trial.

[4] Defendants have also interposed an objection to the testimony of the Simons based on cumulativeness. While the Court stated in open court that Plaintiff may offer the testimony of all three of the Simons, the Court will entertain a renewed motion to exclude testimony on the ground it is cumulative depending on how the testimony proceeds at trial.

significant knowledge about insurance products, which they presumably relied upon while negotiating the JCA.  It is a necessary part of their business to make the appropriate calculations in order to determine the potential profitability of any particular product.  Therefore, provided a proper foundation is laid, the Simons can testify as lay witnesses under Rule 701 with respect to the analyses, calculations, and assumptions they relied upon when negotiating the JCA.  *RMS of Wis., Inc. v. S-K JV*, No. 13-CV-1071, 2016 WL 3212086, at *3 (E.D. Wis. June 9, 2016) ("Wilinski did much of the preliminary research into the Indianapolis Project and participated in the decision making as to whether to enter into the subcontract. . . . [, thus he] will be permitted to testify as a lay witness under Rule 701 as to the facts of the business underlying his profit expectations but will not be allowed to make inferences from the data.").

Defendants argue that potential PEAK commissions (both first-year and trailing) and the ability to obtain financing in the future on a product as unique as PEAK are not appropriate subjects for lay opinion testimony under F.R.E. 701.  As an initial matter, Scott Carney, Head of Life Project Management at ING U. S., testified at his deposition that the average first-year commission rates on PEAK policies potentially to be issued might be 5.5%.  Indeed, this was a figure relied on by Defendants in making their own business evaluation of the profitability of the PEAK policies.  It is, therefore, permissible for Plaintiff to base its estimate on Defendants' own determination of what the average first-year commission rates would be.  Moreover, to the extent the Simons conducted such analyses before executing the JCA so that they could determine whether LPI was going to enter into the agreement, the Simons are allowed to testify as to these topics based on their personal knowledge.  *See CIVIX-DDI, LLC v. Hotels.com, L.P.*, No. 05 C 6869, 2012 WL 6591684, at *4 (N.D. Ill. Dec. 18, 2012) ("Mr. Semple [as a co-inventor] may provide relevant factual testimony from his personal knowledge about the contents of the patent application, the prior art he reviewed and analyzed in creating the patent and in assisting Civix's patent prosecution counsel, the negotiation process for patent licenses, and the terms of patent licenses he negotiated.  He may also provide testimony regarding opinions he formed while involved with license negotiations, the patent prosecution and patent development process.  Mr. Semple, however, cannot opine on the questions that involve legal conclusions or rely on specialized scientific or technical knowledge beyond that which is necessary to testify to his personal knowledge of various issues related to the '291 patent.").  Any weaknesses in the Simons' determinations or conclusions, as they existed at that time, can be brought out on cross examination.

Defendants also complain of a lack of notice.  Defendants' request to delay the commencement of the trial in this case has cured any cause for complaint as to lack of notice.  To the extent that the proposed testimony as to damages by the Simons and others who are also fact witnesses in this case may confuse the jury, the Court will consider any appropriate jury instruction Defendants wish to propose to address that issue.

Therefore, based on the analysis detailed above, the motion to bar Plaintiff from introducing at trial lay testimony by any principal of LPI (David Simon, Pamela Simon and Adam Simon) as to the calculation of any LPI's lost profits is denied.

5. Defendants' Motion in Limine # 5 (Bar Evidence at Trial of Butch Britton's Remarks Regarding Advising Other Insurance Carriers Not to Work with LPI)

This motion seeks to bar questions and answers relating to alleged illegal and unlawful conduct, namely Butch Britton's (CEO of Insurance Solutions – Retail, Life and Employee Benefits for ING US) statement regarding why a shock lapse could never occur, and that if Pam Simon tried to terminate the policies and take Plaintiff's business elsewhere, he would "tell any new carrier that they should not work with her."

As the Court pointed out during arguments on the motions in limine, when considered in full context, this is clearly a statement made by Britton in an attempt to obtain approval for the issuance of the policies, which Plaintiff nevertheless wishes to introduce for the purpose of showing SLD (acting through Britton) was not acting in good faith in exercising discretion to decline to issue the policies. The assumption underlying Plaintiff's position is that Britton's willingness to discredit the Simons and LPI shows a general lack of honesty and fair dealing or good faith. In its opinion, the Seventh Circuit stated that Britton's comment "could support a reasonable finding that [SLD's] conduct breached the implied covenant." *Life Plans, Inc. v. Sec. Life of Denver Ins. Co*., 800 F.3d 343, 355 (7th Cir. 2015).

But, in reviewing its notes, the Court observes that Plaintiff's counsel did argue a second, more persuasive reason for allowing this statement to come in as an admission: To the extent that OCEO executives ignored what Britton said, *i.e*., that no shock lapse would occur, any argument that the PEAK policy was rejected on that basis is pretextual, thus supporting their claim that rejection of the product violated the covenant of good faith and fair dealing. The jury will be called on to determine the legitimacy of SLD's decision-making process in declining to issue the PEAK policies and this discussion was a part of that process. Therefore, the motion to bar is denied and evidence of the statement will be allowed.

6. Defendants' Motion in Limine # 6 (Bar Plaintiff from Introducing Testimony of Jan Hommen, Willem Nagel and Patrick Flynn)

Willem Nagel is the Chief Risk Officer at ING Groep and sits on the Board of Directors of ING U.S. As Chief Risk Officer of ING Groep, Nagel reports to ING Groep Chairman and CEO Jan Hommen. Patrick Flynn is the CFO of ING Groep and sits on the Board of Directors of ING US.

Defendants argue that Hommen, Nagel and Flynn are among the highest-level executives of the ING Groep N.V., the ultimate parent company of Defendants and, as such, none of these individuals had any involvement with, or knowledge of, the underlying transactions,

negotiations, or discussions at issue in this action.  Defendants therefore seek to bar their deposition testimony in its entirety.  These witnesses may have relevant information as to the relationship in the decision-making process between ING U.S., Inc. and ING Groep N.V., including the distinction, if any, between the different approval processes in place and which process was the appropriate one to utilize.  To the extent that the motion objects to "harassing, oppressive and argumentative questioning," Defendants may make the appropriate objections if any such conduct should occur and the Court will rule in the context of trial.  The motion to bar all such testimony is denied.

**Date:**  January 11, 2017

**Ronald A. Guzmàn**
**United States District Judge**